# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| LABORERS' PENSION FUND, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 07 C 2156 |
| v. | ) |
| | ) Honorable Charles R. Norgle |
| DYNAMIC WRECKING & | ) |
| EXCAVATION, INC., et al., | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

CHARLES R. NORGLE, District Judge

Before the Court are cross-motions for summary judgment. Plaintiffs, Laborers' Pension Fund ("Pension Fund") and the Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Funds" or "Plaintiffs") moved for summary judgment as to all counts of the First Amended Complaint. Defendants, Dynamic Wrecking & Excavation, Inc. ("Dynamic Wrecking") and Rasheed Bonds ("Bonds") (collectively, "Defendants"), individually and on behalf of Dynamic Wrecking, moved for summary judgment as to Counts III and IV of the First Amended Complaint. Because the motions arise from the same set of operative facts, the Court shall decide them concurrently. For the following reasons, the Funds' motion for summary judgment is granted as to liability on Counts I and II of the First Amended Complaint. The Funds' motion is denied as to Counts III and IV. Defendants' motion for summary judgment on Counts III and IV is denied in its entirety.

# I. BACKGROUND

## A. FACTS

On June 26, 2003 Rasheed Bonds ("Bonds"), the president of Dynamic Wrecking, signed an Independent Construction Industry Collective Bargaining Agreement ("CBA") with the Construction and General Laborers' District Council of Chicago and Vicinity ("Union"). As a signatory to the CBA, Dynamic Wrecking became bound by the parties' "Wrecking Agreement," a contract that the Union entered into with the Chicago Demolition Contractors' Association. The Wrecking Agreement, hereinafter referred to as the "Joint Agreement," contained the reporting requirements and the description of covered work for the signatories of the CBA.

Pursuant to the CBA and the Joint Agreement, Dynamic Wrecking was required to pay to the Funds contributions for pension benefits, health and welfare benefits and employee dues on behalf of those employees covered under the CBA. In addition to collecting contributions, the Funds served as the Union's collection agent, which was responsible for collecting any outstanding dues owed to the Funds. To ensure that the contributing employers complied with the Joint Agreement's reporting and contribution requirements, the Joint Agreement authorized the Funds to designate payroll auditors, who requested and reviewed the contributing employers' books and records and, using those records, determined whether the employers contributed funds on behalf of covered employees pursuant to the agreements.

In this case, in the event Dynamic Wrecking failed to pay timely contributions to the Funds, the CBA and the Joint Agreement authorized the Funds to assess late fees and interest payments as a result. Additionally, the agreements required delinquent employers to incur the cost of collection. As further protection, Dynamic Wrecking was required to purchase a bond in

2

the amount of $50,000 to guarantee its contributions to the Fund. Dynamic Wrecking failed to purchase such a bond.

Eventually Dynamic Wrecking fell behind on its payments to the Funds. The Funds' representative, Joseph Gilleran, spoke with Bonds regarding a payment plan for Dynamic Wrecking's outstanding debt. See Pl.'s Rule 56.1(b) Statement of Facts [Docket 83], Ex. B, Gilleran Notes of Dec. 5, 2006 ("Gilleran Note"). Bonds agreed to pay the company's debt pursuant to the payment plan that Gilleran suggested. Thus, to finance what Dynamic Wrecking owed to the Union, Gilleran prepared a six month installment note ("Note 1") and sent it to Bonds at Dynamic Wrecking. Note 1 required Dynamic Wrecking to pay the Pension Fund $11,720.28 in six, monthly payments commencing on December 1, 2006 and ending on May 1, 2007, which included liquidated damages and interest. See Binder of Exhibits for Pl.'s Memo in Support ("Pl.'s Binder"), Ex. M. The parties executed Note 1 on December 1, 2006. Id. Dynamic Wrecking made four payments on Note 1 and stopped making payments thereafter.

In light of Dynamic Wrecking's failure to pay, another Fund representative, Denise Ayala ("Ayala"), faxed a letter to Dynamic Wrecking on December 14, 2006, requesting that it issue a check for $5,739.67, which was the amount of dues missing for September through November 2006. Ayala also spoke with Bonds over the telephone, at which time Bonds informed Ayala that he was unable to pay the outstanding amount. Specifically, Ayala's letter said:

> **Please issue a check in the amount of $5,739.67.** This amount covers delinquencies for your September through November 2006 Work Dues for the Laborers.
>
> **I will be sending someone to pick up the check tomorrow, December 15th.**
>
> Please note that if payment isn't received by December 15th, job action may be taken.

3

Def.'s Memo in Support of Mot., Ayala Fax, Ex. 14 [emphasis in original]. The next day two men appeared at Dynamic Wrecking's office and requested the check from Bonds. The two men, however, neither threatened Bonds nor harmed Bonds, either physically or economically. In fact, Bonds simply informed the men that he did not have any money, and the men left.

On or about February 14, 2007 Gilleran contacted Bonds regarding Dynamic Wrecking's missing payments for the period of October through December 2006. Bonds acknowledged the debt and requested more time to pay down what the company owed on Note 1. Gilleran, as an alternative, requested that Bonds sign an additional financing agreement ("Note 2") to structure Dynamic Wrecking's debt in a manner similar to Note 1. Note 2 required that Dynamic Wrecking pay the pension Fund $52,246.04 in six monthly payments commencing on March 1, 2007 and ending on August 1, 2007. See Pl.'s Binder, Ex. N. Note 2 also required that Dynamic Wrecking pay upon executing the note an initial down payment equal to twenty percent of Dynamic Wrecking's outstanding debt. Id. As additional protection for Note 2, Gilleran sent to Bonds a document titled, "Guaranty of Payment and Indemnification" ("Personal Guarantee"). Pursuant to the Personal Guarantee, Bonds would become the Guarantor of Dynamic Wrecking's outstanding debt to the Funds, which included the amount of Note 2, any costs incurred to collect on Note 2 and all contributions owed to the Funds at the time Bonds executed the Personal Guarantee. See Pl.'s Binder, Ex. O.

Bonds received via facsimile a copy of Note 2 and the Personal Guarantee on February 14, 2007. Thereafter, according to Bonds' deposition testimony, Gilleran called Bonds "every day," from February 14, 2007 to March 9, 2007, sometimes twice a day, demanding that Bonds sign the agreements. See Pl.'s Binder, Ex. C, Dep. of Rasheed Bonds ("Bonds Dep.") at 48-49, 51, 54-55. Gilleran directly contested this assertion, however, and testified in a supplemental

4

affidavit that, "At no time did I call Rasheed Bonds, president of Dynamic, more than twice a week, either in relation to the delinquencies at issue or at any other time." See Pl.'s Rule 56.1(b) Statement of Facts, Ex. A, Supp. Aff. of Joseph Gilleran ("Gilleran Supp. Aff.") at ¶ 2.

Bonds also testified that Gilleran threatened Bonds with legal action if he failed to sign the agreements. Id. at 55. Other than this perceived threat, Bonds testified that he was not threatened with harm and that his failure to sign Note 2 and the Personal Guarantee would not lead to interference with his personal life. See Bonds Dep. at 149-52. Rather, Bonds responded with the answer, "I don't know," when asked directly whether he was ever threatened with personal harm. Id. at 150-52. Gilleran confirmed this part of Bonds' testimony, stating, "At no time did I tell Bonds [...] that there would be consequences if Bonds did not sign the installment notes or personal guarantee, except that the Funds would seek to collect the delinquency through litigation." See Gilleran Supp. Aff. at ¶ 6.

Nevertheless, while Bonds denies having been expressly threatened, he testified that he feared repercussions if he refused to sign the agreements. Id. Bonds testified that the basis for his fear was, "the way they sound ..., the tone of their voice, their actions." Id. at 152. On March 9, 2007 Bonds executed Note 2 and the Personal Guarantee. With that, the phone calls stopped, at least for a while. Id. at 155. Dynamic Wrecking made two payments on Note 2 and stopped making payments thereafter.

## B. PROCEDURAL HISTORY

On November 1, 2007 Plaintiffs filed their Amended Complaint against the Defendants seeking to collect unpaid contributions pursuant to the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq., ("ERISA") and pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"). Plaintiffs also sought to collect the balance of

5

payments owed under Notes 1 and 2 and to enforce the Personal Guarantee against Rasheed Bonds. Specifically, Plaintiffs asserted claims for Defendants' failure to pay employee benefit contributions (Count I), failure to pay union dues (Count II), default on Note 1 for ten percent penalties (Count III) and default on Note 2 and the Personal Guaranty (Count IV). Plaintiffs moved for summary judgment on all Counts of their First Amended Complaint.

Defendants moved for summary judgment on Counts III and IV of the First Amended Complaint, asserting that Bonds executed the agreements underlying Counts III and IV under duress, which makes those agreements void. Defendants further claim as to Count IV that the Personal Guaranty is void because it was not supported by consideration at the time of execution. Both motions are fully briefed and now before the Court

## II. DISCUSSION

### A. STANDARD OF DECISION

Summary judgment is permissible when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The nonmoving party cannot rest on the pleadings alone, but must identify specific facts, see Heft v. Moore, 351 F.3d 278, 283 (7th Cir. 2003), that raise more than a mere scintilla of evidence to show a genuine triable issue of material fact. See Vukadinovich v. Bd. of Sch. Tr.'s of North Newton School, 278 F.3d 693, 699 (7th Cir. 2002). Under this standard, "[c]onclusory allegations alone cannot defeat a motion for summary judgment." Thomas v. Christ Hospital and Medical Center, 328 F.3d, 890, 892-93 (7th Cir. 2003) (citing Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888-89 (1990)).

In deciding a motion for summary judgment, the court can only consider evidence that would be admissible at trial under the Federal Rules of Evidence. See Stinnett v. Iron Works

Gym/Executive Health Spa, Inc., 301 F.3d 610, 613 (7th Cir. 2002). The court views the record and all reasonable inferences drawn the record in the light most favorable to the non-moving party. See Fed. R. Civ. P. 56(c); see also Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1108 (7th Cir. 2004). "In the light most favorable" simply means that summary judgment is not appropriate if the court must make "a choice of inferences." See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); see also First Nat'l Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 280 (1968); Spiegla v. Hall, 371 F.3d 928, 935 (7th Cir. 2004). The choice between reasonable inferences from facts is a jury function. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## B. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs' motion for summary judgment can be divided into two issues: (1) the issue of liability; and (2) the issue of damages. As to liability, Counts I and II seek to hold Defendants liable for the amount of contributions and dues owed to Plaintiffs, along with any interest, fees and costs, pursuant to the CBA. Count III seeks to hold Defendants liable for the amounts owed to Plaintiffs, along with fees and costs, pursuant to Note 1. Count IV seeks to hold Defendants liable for the amounts owed to Plaintiffs, along with fees and costs, pursuant to Note 2 and the Personal Guaranty.

### *1. Counts I and II: Damages*

The Defendants do not contest their liability under the CBA. It is undisputed that Bonds signed the CBA, operated under the CBA, made payments pursuant to the CBA and subsequently acknowledged his outstanding debt under the CBA. Therefore, the Court grants summary judgment in favor of Plaintiffs on Counts I and II as to liability. The only issue that remains as to Counts I and II is the amount of damages that the Defendants owe the Funds.

7

On this point, Defendants dispute the accuracy and the validity of the 2007 audit report, which is at the core of Plaintiffs' claim for damages. The Defendants point out that they uncovered several inconsistencies after the deposition of the Funds' auditor, Hector Cabrales. Specifically, Defendants assert: the audit report does not reflect several months that Dynamic Wrecking did not employ union laborers; that the audit report miscalculated hours; that the audit report failed to account for contributions paid through an installment plan; and that the audit report contained several inputting errors. As it turned out, the Plaintiffs eventually conceded that the 2007 audit report was inaccurate and thus sent to Defendants a new audit report on March 3, 2008, one week before filing their motion for summary judgment. Under the new, revised audit report, Plaintiffs claim liability in the amount of $57,639.08. But, once again, the Defendants claim that the new 2008 audit report is "replete with inaccuracies" and therefore unreliable. See Def.'s Resp. in Opp'n at 3-4; see also Def.'s Add'l Facts, ¶¶ 11-25.

In response, Plaintiffs assert that a distinct 2008 audit report does not exist. Instead, Plaintiffs explain that the Funds' representative, Gilleran, simply reduced the earlier audit report to the extent it shows any delinquencies duplicated by the addition of Note 2. See Pl.'s Reply in Support of Mot. at 2. Plaintiffs further argue that inaccuracies in the audit report account for only a small number of hours and thus should not bar summary judgment for the remaining, much larger number of hours that, supposedly, are undisputed. Id. at 3.

Based on the parties' representations, the Court sides with the Defendants and finds that it is premature to grant summary judgment on the amount of damages based on the issues of fact that remain as to the accuracy of the audit report. See Ill. Conference of Teamsters & Employers Welfare Fund v. Steve Gilbert Trucking, 71 F.3d 1361, 1367 (7th Cir. 1995) (reversing a grant of summary judgment where issues of fact remained outstanding on the accuracy of the fund's

8

audit). This Court is not persuaded that a factual issue does not exist as to those hours in the revised audit report that the Plaintiffs claim are undisputed, where the Defendants have not had an opportunity to fully develop their objections to the revised audit report, even if those revisions are minor, as Plaintiffs suggest. As such, the Court finds that the Defendants have raised a genuine issue sufficient to withstand summary judgment as to the amount of damages it owes to the Funds. See id.

As to the timeliness of Defendants' objections to the audit report, it is important to note that the Plaintiffs submitted the revised audit report only one week before the filing of their motion for summary judgment. In this way, drawing an inference in favor of the non-moving party, the Defendants did not have time to object to the revised audit report prior to Plaintiffs' motion for summary judgment. Thus, this is not a case in which a party raised those objections for the first time in responding to a summary judgment motion, see MCI Telecomm. Corp. v. Ameri-Tel, Inc., 852 F.Supp. 659, 666 (N.D. Ill. 1994), when it could have raised its objections previously. Here, given the timing of Defendants' revised audit, Plaintiff was left with no choice but to attack the sufficiency of the revised audit in its response to summary judgment. Again, if further investigation is necessary and questions still remain as to the amount of damages, this issue is not ripe for summary judgment. See, e.g., Searls v. Glasser, 64 F.3d 1061, 1065 (7th Cir. 1995).

### 2. *Counts III and IV: Validity of the Installment Notes and the Personal Guaranty*

As to Counts III and IV, the Defendants defend on this motion and seek summary judgment on the same arguments – duress and lack of consideration as to the underlying agreements. The Court denies Plaintiffs' motion for summary judgment on Counts III and IV on the same grounds that it denies the Defendants' motion for summary judgment in its entirety. As

9

such, the Court shall adopt in this section its reasoning for denying Defendants' motion for summary judgment on Counts III and IV, which is set forth below.

## C. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### 1. Moral Duress

In response to Counts III and IV, which involve breaches of Note 1, Note 2 and the Personal Guaranty, the Defendants claim that those agreements are void because Bonds executed them under moral and economic duress. But, we need not consider the issue of moral duress because the Defendants failed to plead this defense at any point prior to summary judgment.

The Federal Rules of Civil Procedure require that all affirmative defenses be specifically pleaded. FED. R. CIV. P. 8(c). Rule 8(c) provides that "in responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including...duress." Id. If a party fails to plead in its answer any of the affirmative defenses under Rule 8(c), those defenses are deemed waived. See Johnson v. Sullivan, 922 F.2d 346, 355 (7th Cir. 1990) (finding statute of limitations defense waived when defendants did not include it in the answer); see also Yohannan v. Patla, 971 F. Supp. 323, 326 (N.D. Ill. 1997) (finding res judicata defense waived when defendants failed to raise it in their answer). But this rule is not unyielding in the Seventh Circuit, which holds that a waiver only occurs if the plaintiff would be harmed as a result. Curtis v. Timberlake, 436 F.3d 709, 711 (7th Cir. 2005). A showing of prejudice by the Plaintiff can satisfy the element of harm. See BMO Capital Markets Corp. v. McKinley Medical LLC, No. 06 C 6071, 2007 WL 2757172, at *10 (N.D. Ill. Sept. 18, 2007) (finding plaintiff was harmed when defendant raised affirmative defense after discovery closed and in response to plaintiff's motion for summary judgment).

In this instance, the Defendants expressly pleaded economic duress in their Answer to the First Amended Complaint, but made no mention of moral duress. Through their Fifth Affirmative Defense, the Defendants reserved the right to raise additional affirmative defenses, but they failed to request leave to amend their Answer or to assert an additional affirmative defense, even after discovery closed. In fact, moral duress did not come into play until the Defendants responded to Plaintiffs' motion for summary judgment. To allow Defendants to assert moral duress now, at this stage of the proceedings, would deny Plaintiffs the opportunity to investigate and to conduct discovery as to the validity of such a defense. Discovery has long been closed. The Court therefore finds that it would be prejudicial to Plaintiffs if Defendants were allowed to raise the affirmative defense of moral duress in response to a motion for summary judgment. That defense has been waived.

### 2. *Economic Duress*

In addition, the Defendants assert that Plaintiffs' conduct rendered Note 1, Note 2 and the Personal Guaranty void because of economic duress. In Illinois, economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances which deprive him of the exercise of free will. Resolution Trust Corp., 977 F.2d 309, 313 (7th Cir. 1992) (citing J.D. Alexander v. Standard Oil Co., 423 N.E.2d 578, 582 (Ill. App. Ct. 1981)). The defense of economic duress permits release from an obligation under a contract "on the theory that the party is deemed to have lacked the mental capacity requisite to the making of a contract." Herget Nat'l Bank of Pekin v. Theede, 537 N.E.2d 1109, 1111 (Ill. App. Ct. 1989). Thus, to establish economic duress, one must demonstrate that the threat has left the individual "bereft of the quality of mind essential to making the contract." See Resolution Trust Corp., 977 F.2d at 313; see also Herget Nat'l Bank, 537 N.E.2d at 1111. In doing so, the party claiming economic

duress must show that it was induced to enter into a contract by some wrongful act of the other contracting party. J.D. Alexander, 423 N.E.2d at 583.

Duress is not shown by the fact that one was subjected to mere annoyance, vexation, personal embarrassment, a difficult bargaining position or the pressure of financial circumstances. See Selmer Co. v. Blakeslee-Midwest Co., 704 F.2d 924, 928 (7th Cir. 1983) ("The mere stress of business conditions will not constitute duress where the defendant was not responsible for the conditions"); FDIC v. Linn, 671 F. Supp. 547, 560 (N.D. Ill. 1987) ("Defendants cannot blame [plaintiffs] for the pressures caused by defendants' own business decisions and by general economic conditions"); Herget Nat'l Bank, 537 N.E.2d at 1112. The pressure applied must be wrongful; mere hard bargaining is not enough. Linn, 671 F. Supp. at 558. Moreover, a party's threat to assert its legal rights does not rise to the level of duress unless it involves some abuse of the legal process. Thelin v. Mitchell, 576 F. Supp. 1404, 1408 (N.D. Ill. 1983); Linn, 671 F. Supp. at 558 ("[D]uress cannot be predicated upon a demand which is lawful or upon doing or threatening do that which a party has a legal right to do"). Rather, the conduct of the party obtaining the advantage must be shown to be tainted with some degree of fraud or wrongdoing in order to have an agreement invalidated on the basis of duress. Id. Finally, one cannot successfully claim duress as a defense to a contract when he had an alternative to signing the agreement. Pierce v. Atchison, Topeka & Santa Fe Railway Co., 65 F.3d 562, 569 (7th Cir. 1995).

The facts of this case raise an inference that cuts both ways. They can be summarized as follows. Defendants entered into a collective bargaining agreement. The Defendants failed to pay under the agreement. Plaintiffs sent a letter to Defendants demanding that Defendants pay under the agreement and explaining, in bold terms, that they intended to send someone to pick up

a check the next day. The next day two men arrived at Defendants' offices. No direct threats were conveyed to Defendants. The Defendants told the men that they did not have any money. Later the Plaintiffs suggested that the Defendants enter a payment plan to assist with the outstanding debt. Defendants complied. Defendants, once again, failed to make timely payments. Plaintiffs made several phone calls to Defendants, over a period of approximately three weeks, insisting that Defendants restructure and personally guarantee the outstanding debt. Defendants complied, made a few payments under the note and then stopped. Plaintiffs filed this lawsuit.

Based on these facts, Defendants assert that Plaintiffs' persistent conduct instilled a fear in Bonds that caused him to execute Note 1, Note 2 and the Personal Guaranty without the quality of mind essential for making a contract. In support, Defendants rely on the company's uncertain financial condition, Ayala's letter, Gilleran's frequent phone calls and the arrival of unwanted collectors at Defendants' offices. Yet, keeping in mind the above cases, it is of no consequence that the Defendant was struggling financially or that Ayala, in her letter to Bonds, threatened a strike, which was a legally viable option.

For the most part, Defendants' duress is comprised of factual characterizations that remain unsupported either by the documentary evidence or by Bonds's express testimony. Nevertheless, it is plausible that Plaintiffs' conduct, taken together, caused Bonds to fear some economic repercussions if he did not enter into the agreements. Thus, despite the weakness of Defendants' duress defense, the Court finds that the Defendants have raised enough to create a genuine issue of fact as to whether Bonds entered into the agreements under economic duress. Accordingly, summary judgment is denied as to both parties on Counts III and IV.

### *3. Lack of Consideration*

Finally, the Defendants argue that the Personal Guaranty is void because it was not supported by consideration. In response, the Plaintiffs raise two issues: (1) that the Defendants failed to plead failure of consideration as an affirmative defense; and (2) that the Personal Guaranty was part of the overall agreement to reorganize the debt, which served as sufficient consideration. The Court agrees with the Defendants on both issues.

The Defendants, as with their moral duress defense, raised for the first time the defense of lack of consideration in their Response to Plaintiff's motion for summary judgment. Again, discovery has long been closed in this case. Defendants did not request to amend their Answer, nor did they request to add a defense for lack of consideration at any point prior to the motion for summary judgment. As a result, Plaintiffs did not have an opportunity to engage in discovery with respect to this affirmative defense. The Court therefore finds that Defendants waived their affirmative defense of lack of consideration as to Count IV.

Notwithstanding Defendants' waiver, a defense against Count IV based on lack of consideration would fail. A guaranty must be supported by consideration just as is the case for any other contract. Tower Investors, LLC v. 111 E. Chestnut Consultants, Inc., 864 N.E.2d 927, 937 (Ill. App. Ct. 2007). In determining the rights of the parties to a guaranty, as in determining the rights and obligations flowing from any contract, we must look first to the language of the document itself. Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. Stanley, 606 F. Supp. 558, 561 (N.D. Ill. 1985).

Here, the guaranty contains broad statements of Bonds's – the guarantor – liability. It is undisputed that Bonds executed the guaranty at the same time he executed Note 2, which restructured Dynamic Wrecking's debt. In Illinois, it is well-established that there is adequate

consideration for a guaranty, where the guaranty is executed contemporaneously with the creation of the principal loan. Cont'l Ill. Nat'l Bank & Trust, 606 F. Supp. at 561 (citing ITT Diversified Credit Corp. v. Kimmel, 508 F. Supp. 140, 143 (N.D. Ill. 1981)). This applies equally to a personal guaranty executed along side an agreement to restructure one's debt. See QST Indus., Inc. v. Feinberg, No. 01 C 1023, 2003 WL 260674, at *7 (N.D. Ill. Feb. 6, 2003) ("A guaranty which is executed contemporaneously with the debt it guarantees is supported by sufficient consideration."). If we apply this principle to the case at bar, Defendants' argument fails because Bonds signed the guaranty as a condition to receiving the terms of the underlying note. Bonds executed both documents contemporaneously and benefitted by having Dynamic Wrecking's debt restructured and by not having the debt come immediately due. The Court therefore finds that there was adequate consideration to support the parties' Personal Guaranty. See In re Xonics Photochemical, Inc., 841 F.2d 198, 201 (7th Cir. 1988) (noting that a guaranty is enforceable, provided that the guarantor derives some benefit, even if indirect). This defense does not give rise to summary judgment on Count IV.

## III. CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Summary Judgment is granted on Counts I and II of the First Amended Complaint as to liability only. Plaintiff's motion is denied on Counts III and IV. Defendants' Motion for Summary Judgment is denied.

IT IS SO ORDERED.

ENTER:

_____
CHARLES R. NORGLE, Judge
United States District Court

DATED: 6-13-08

15